IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Criminal Case No. 13-cr-00160-PAB-7

UNITED STATES OF AMERICA,

      Plaintiff,

v.

7. SANTOS ADOLFO FUNEZ,

      Defendant.
_____

### FINDINGS OF FACT FOR TRIAL
_____

      The Court presided over a trial to the court in this case from May 27, 2014 through May 30, 2014.  The defendant is charged in Count One with conspiracy to possess with intent to distribute fifty grams or more of methamphetamine and five hundred grams or more of a substance containing a detectable amount of methamphetamine from on or about April 2012 through April 23, 2013, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(viii); in Count Twenty-Three with possession with intent to distribute fifty grams or more of methamphetamine and five hundred grams or more of a substance containing a detectable amount of methamphetamine from on or about January 11, 2013 through January 12, 2013, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii); and in Count Twenty-Four with using a communication facility on or about January 7, 2013 to commit or facilitate the offense of conspiring to distribute and possess with intent to distribute fifty grams or more of methamphetamine and five hundred grams or more of a substance containing a

detectable amount of methamphetamine in violation of 21 U.S.C. § 843(b).  Pursuant to Federal Rule of Criminal Procedure 23(c), the Court makes the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

1.  In the spring of 2012, Denver's Metro Gang Task Force ("Task Force") began conducting surveillance on an organization that was transporting methamphetamine from California to Colorado for distribution and sale.  Using wiretaps, surveillance, debriefing of informants, global positioning system ("GPS") search warrants, mail covers, trash covers, and interviews of local law enforcement, investigators determined that the organization was led by Fernando Mendoza-Gomez.  Mr. Mendoza-Gomez sent methamphetamine by automobile to his brother-in-law, Pedro Miguel Lujano-Gonzalez, in Denver, Colorado.  Another member of the organization, Carlos Salcido-Garcia, also received and distributed pound and kilogram quantities of methamphetamine in Denver during the times charged in the indictment.

2.  In late August 2012, investigators intercepted calls in which members of the organization mentioned the defendant, referring to him by the name "Cuchifleto."[1]

3.  On October 24, 2012, investigators intercepted a call between Mr. Mendoza-Gomez and another member of the organization indicating that Mr. Salcido-Garcia was at 32nd Avenue and Federal Boulevard in Denver.  Investigators went to the location and observed two individuals get into a white tow truck and drive south on Federal

---

[1]The defendant denied any knowledge of being referred to by this name.  Mr. Mendoza-Gomez testified that he was not sure how the defendant got that name, but it was similar to "Cuchifleta," a car in a cartoon show that played on television in Mexico.

Boulevard to a muffler shop at Federal Boulevard and 20th Avenue.  Officer Kelly

Draper, an investigator with the Arapahoe County Sheriff's Office and a member of the

Task Force, took a photograph of Mr. Funez, Mr. Salcido-Garcia, and Mr. Mendoza-

Gomez in front of the white tow truck outside of the muffler shop.  Exhibit ("Ex.") 5.[2]

After the tow truck left the shop, investigators observed a marked police vehicle pull the

tow truck over.  The police officers identified the driver of the truck as Mr. Funez and

the passenger as Mr. Salcido-Garcia.

4.  On December 20, 2012, investigators intercepted a call between Mr. Lujano-

Gonzalez and Mr. Funez.  Ex. 13 and 13a.  During the call, Mr. Funez asked, "What's

up? Any departures tomorrow?"  Ex. 13 at 1.  Later in the call he said, "I would like for

us to go now before Christmas, so there's something."[3]  *Id*.

5.  On December 21, 2012, investigators intercepted a call between Mr. Lujano-

Gonzalez and Mr. Funez.  Ex. 15 and 15a.  During the call, Mr. Funez said, "right now I

don't have a single cent on the credit card, but we can put some money on the credit

card, and I can rent a vehicle."  Ex. 15 at 1.  Later in the call, he said, "I can rent a SUV

so it looks really good, you know?"  *Id*. at 2.  He also said, "tell him that I'm already out

on vacation from school, that right now I'm ready at the– at any time he wants."  *Id*.

6.  On January 7, 2013, investigators intercepted a call between Mr. Mendoza-

Gomez and Mr. Funez.  Mr. Mendoza-Gomez asked Mr. Funez, "[c]an you come or

what?"  Mr. Funez said he could come on Friday, but had to be back on Sunday to be

---

[2]All citations to exhibits refer to exhibits introduced at trial.

[3]The recorded conversations introduced at trial were conducted in Spanish, but
the parties stipulated to the accuracy of the English translations.  Ex. 8.

able to go to school on Monday.  Exs. 19 and 19a.  At the time, Mr. Funez was taking classes at Lincoln College of Technology to earn his Automobile Mechanic's License. Mr. Funez said, "Just let me know about the money and I can rent a car on my own . . . ."  Mr. Mendoza-Gomez, however, indicated "you come on the airplane and take the car."  Mr. Mendoza-Gomez asked if Mr. Funez could bring "a document–a paper" with him and then said that it would be "five or six pesos."  Ex. 19 at 5.  Mr. Funez responded "[S]ure.  I will put half in the wallet and half in the . . . in the backpack and it is legal for me."  Ex. 19 at 5 (ellipsis in original).  Mr. Mendoza-Gomez told Mr. Funez that, "if something happens, say that you're coming to buy a car, okay?"  *Id*.

7.  After intercepting the January 7, 2013 call, investigators applied for and received authority to obtain GPS data for Mr. Funez' mobile telephone.

8.  On January 8, 2013, investigators intercepted a call between Mr. Mendoza-Gomez and Mr. Funez in which Mr. Mendoza-Gomez asked for Mr. Funez' date of birth and the spelling of his name so that Mr. Mendoza-Gomez could buy an airplane ticket to California for Mr. Funez.  Exs. 20 and 20a.  Mr. Mendoza-Gomez said that he would buy the ticket for Friday afternoon.  Ex. 20 at 4.

9.  On January 11, 2013, investigators intercepted a call between Mr. Mendoza-Gomez and Mr. Funez in which the two agreed to meet at a King Soopers grocery store on 84th Avenue and Pecos Street in Denver.  Ex. 22 and 22a.

10.  On January 11, 2013, investigators observed Mr. Funez go to the airport in Denver and board a 3:40 p.m. flight for California.  The Task Force had surveillance teams in place in both Denver and Los Angeles.  Joshua Mohlman and Scott Cooper, police officers with the Aurora Police Department and members of the Task Force, flew

to California on the same flight as Mr. Funez.  The flight arrived at Los Angeles International Airport at 5:40 p.m.  Officers Mohlman and Cooper observed Mr. Funez get off the airplane and walk around the terminal while talking on his cell phone.  They observed him meet up with a Hispanic man outside the terminal and enter an elevator to a parking garage, at which point they lost contact with Mr. Funez.  FBI Special Agent Scott Alexander met Officers Mohlman and Cooper at the airport and drove them to the City of South Gate in Los Angeles County, where they expected Mr. Funez would go based on calls between other members of the organization they had previously intercepted.

11.   Toll records for Mr. Funez' cell phone indicate that Mr. Funez did not make any outgoing calls between 6:06 p.m. Mountain Standard Time on Friday, January 11, 2013 and 11:30 p.m. Mountain Standard Time on Saturday, January 12, 2013.  Ex. 65.

12.   At 7:10 p.m. on January 11, 2013, using GPS data gathered by FBI Special Agent Julio Tobar, another member of the Task Force, investigators located Mr. Funez at a fast food restaurant on the corner of Atlantic Avenue and Firestone Boulevard in South Gate.  Ex. 41.  The investigators observed Mr. Funez get into a silver GMC Envoy, driven by an unidentified man, outside the restaurant.  Investigators followed the Envoy east on Firestone Boulevard to a strip mall off of Imperial Highway.  Ex. 41.  At the strip mall, investigators observed the driver and Mr. Funez get out of the Envoy.  Mr. Funez got into the driver's seat of the Envoy and the other man got into the driver's seat of a black Ford F-250 pickup truck.  The Envoy and the F-250 left the parking lot and went in different directions.  Investigators followed the Envoy to a motel on Firestone Boulevard near the fast food restaurant.  Ex. 41.  Investigators watched the motel

overnight and did not observe Mr. Funez leave on foot or observe the Envoy leave the parking lot.

13.   At approximately 7:30 a.m. on January 12, 2013, investigators observed Mr. Funez get into the Envoy.  Investigators followed the Envoy east on Firestone Boulevard to a Home Depot.  Ex. 41.  The Envoy parked next to a blue Honda at the outer edge of the nearly empty Home Depot parking lot.  Officer Cooper observed Mr. Funez get out of the Envoy and begin speaking with the driver of the blue Honda.  The driver of the blue Honda knelt down by the passenger panel of the Envoy and was pointing at it and talking while Mr. Funez watched him.  Officer Cooper observed both men enter the Home Depot.

14.   Officer Cooper later observed Mr. Funez and the other man leave the Home Depot, with Mr. Funez carrying plastic shopping bags and a length of white PVC pipe.  Mr. Funez opened the rear tailgate of the Envoy, set the bags down in the cargo area, and slid the PVC pipe through the cargo area into the passenger area.  Mr. Funez then attempted to close the tailgate, which was blocked by the PVC pipe sticking out.  Officer Cooper observed Mr. Funez saw off a section of the PVC pipe, replace the two sections in the car, and close the tailgate.  Ex. 46.

15.   FBI Special Agent Jeff Bennett, who was also conducting surveillance, used binoculars to observe the Envoy in the Home Depot parking lot.  He saw Mr. Funez and the driver of the blue Honda hold the PVC pipe up to the back of the Envoy.  One of the men cut the PVC pipe and then measured it against the width of the Envoy.[4]  Agent

---

[4]When eventually found by the police, the PVC pipe was oriented width-wise in the hidden compartment of the Envoy.  Exs. 31 and 32.

6

Bennett did not remember which man he saw cut the PVC pipe.  Although Officer

Cooper's and Special Agent Bennett's accounts differ in certain details, the Court

credits Special Agent Bennett's testimony regarding what he saw the two men do with

the PVC pipe since Special Agent Bennett aided his observation with binoculars.

16.   Investigators saw Mr. Funez get into the Envoy and the other man get into

the blue Honda.  The Envoy followed the Honda out of the parking lot to an alleyway off

South Alameda Street in the City of Los Angeles.  Ex. 41.  The vehicles pulled into an

alley between two residences on Lou Dillon Avenue between 81st and 83rd Streets.

Ex. 42.  Investigators were unable to observe what happened in the alley.  None of the

investigators saw Mr. Funez leave the area on foot or in a vehicle other than the Envoy.

17.   Approximately ninety minutes later, investigators observed the blue Honda

and the Envoy, driven by Mr. Funez, leave the alley.  The Envoy got onto California

State Route 60, heading east.  Ex. 43.  Investigators observed Mr. Funez stop at a

Walmart on 17150 Gale Avenue in the City of Industry and also stop to purchase gas at

a Circle K at 1696 Azusa Avenue before getting back on Route 60.  Exs. 47 and 48.

18.   Investigators contacted James Hoffman, a sergeant with the Sheriff's

Department for the County of San Bernardino, California, to assist with a traffic stop of

the Envoy.  Just before noon, Sergeant Hoffman observed the Envoy traveling north on

Interstate 15 in the City of San Bernardino.  He observed the Envoy driving at sixty-

seven miles per hour in a zone marked fifty-five miles per hour.  He also observed the

Envoy cross two to three feet over the lane line three times.  Sergeant Hoffman

activated his lights and pulled the Envoy over to the side of the road.

19.   After approaching the driver's side window, Sergeant Hoffman asked Mr.

Funez for his license and registration, which Mr. Funez produced.  Mr. Funez said that the car did not belong to him. Exs. 25, 38, and 39.  Sergeant Hoffman noticed that Mr. Funez' hands were shaking.  Mr. Funez told Sergeant Hoffman that he was in a hurry to get to Colorado to go back to school.  Sergeant Hoffman noticed that there was only one key on the key ring and that the inside of the car smelled of cologne.  Sergeant Hoffman found that the cologne was suspicious because, in past cases, he has found that people use cologne to mask the odor of drugs.  Sergeant Hoffman asked Mr. Funez to get out of the Envoy and stand at the front of Sergeant Hoffman's vehicle.  Mr. Funez told Sergeant Hoffman that he had flown in from Colorado the night before to purchase a diesel truck for his brother's landscaping business, but that he did not like the tires on the truck so the people selling the truck let him borrow the Envoy to drive back to Colorado.  Sergeant Hoffman asked Mr. Funez what kind of truck he was originally going to buy and Mr. Funez paused for about thirty seconds before answering that it was a Dodge.  Mr. Funez said that his brother was either going to buy the Envoy or drive it back to California.

20.   Sergeant Hoffman walked around the vehicle to check the vehicle identification number sticker on the doorjamb.  When he did so, he noticed the smell of fresh paint.  Sergeant Hoffman issued Mr. Funez a warning for the traffic violations, Ex. 26, and noticed that Mr. Funez' hands were still shaking.  Sergeant Hoffman asked Mr. Funez if there was anything illegal in the car.  Mr. Funez said no.  Sergeant Hoffman asked if he could search the vehicle, and Mr. Funez agreed.  Sergeant Hoffman filled out a written Consent to Search form. Ex. 27.  Mr. Funez indicated that he would prefer to read the Spanish side of the form.  Mr. Funez appeared to read the form and sign it.

8

Sergeant Hoffman asked Mr. Funez to stand near the front of the Envoy and retrieved his drug detection dog, "Bo," from his vehicle.  Ex. 28.  Sergeant Hoffman walked Bo around the vehicle and then brought her into the Envoy.  Bo alerted to a partially open bag of black plastic gloves in the back seat.  Exs. 37 and 44.  Sergeant Hoffman then conducted a physical search of the Envoy.

21.  Sergeant Hoffman also examined the exterior of the Envoy and noticed that a portion of the passenger's rear wheel well had been freshly painted.  Sergeant Hoffman noticed that the shock mount above the wheel had been modified: two of the bolts appeared to have been recently manipulated because the paint around them was disturbed and the other two bolts were welded to the plate and did not go all the way through the frame.  Ex. 30.  With the help of a backup officer on the scene, Deputy Felix Arreola of the San Bernardino Sheriff's Office, Sergeant Hoffman removed the shock mount and found a white PVC pipe hidden behind it.  Ex. 33.  He then placed Mr. Funez in handcuffs for driving a car with a concealed compartment.  Deputy Arreola transported Mr. Funez to the police station in Rancho Cucamonga, California.

22.  Sergeant Hoffman waited with the Envoy until a tow truck arrived to take it to a tow yard in Ontario, California.  At the tow yard, Sergeant Hoffman removed the PVC pipe from the car.  Ex. 46.  Inside the PVC pipe, he found a substance that the parties have stipulated has a net weight of 1085 grams and contains a detectable amount of methamphetamine.  Exs. 35, 50, and 51.

23.  At the Rancho Cucamonga station, Deputy Arreola brought Mr. Funez to an interview room.  Claus Hartleben, a deputy with the San Bernardino Sheriff's Department, and Brandon Wiebeld, a sergeant with the Sheriff's Department for the

County of Seminole, California, arrived to interview Mr. Funez.

24.   When Deputy Hartleben entered the interview room, Mr. Funez was handcuffed to his chair.   Deputy Hartleben removed the handcuffs.   Then he read Mr. Funez his *Miranda* rights.   Ex. 49.   Mr. Funez answered yes when Deputy Hartleben asked him whether he understood his rights and whether he was willing to speak with the Deputy.

25.   Deputy Hartleben informed Mr. Funez that methamphetamine had been found in his car.   Mr. Funez appeared shocked and puzzled.   In response to questioning, Mr. Funez told Deputy Hartleben that he was from Denver and that he had come to California on January 11, 2013 to buy a vehicle.   Mr. Funez stated that his business was to buy and sell cars.   He stated that he was going to pay $3,500 for the vehicle.   He stated that, after arriving at the airport in Los Angeles, he had gone to a motel off of Atlantic Boulevard, although he did not know the name of the motel.   He stated that, before he was stopped on January 12, 2013, two individuals had shown up at his motel and had shown him the car he was supposed to purchase, but that he did not like the car.   He stated that the individuals then showed him another car, a GMC SUV, which he did like, and that they told him he could drive it back to Colorado without paying up front and that they would pay for his gas.   Towards the end of the interview, Mr. Funez stated that the purchase of the vehicle had been arranged by an individual named Charlie.   Deputy Hartleben asked Mr. Funez if he had contact information for Charlie or for the two individuals who were supposed to sell him the vehicle.   Mr. Funez said he did not.   Mr. Funez did not explain how he met or contacted the two individuals when he arrived in Los Angeles or what type of car he was originally supposed to buy

from them.  In response to questioning on these topics, he stated repeatedly that he was a good person.

26.  When Deputy Hartleben asked Mr. Funez why the individuals would let him drive the Envoy to Colorado without paying for it, he stated that that was the arrangement that he had made with Charlie.

27.  During the interview, Sergeant Wiebeld and Deputy Hartleben counted the money in Mr. Funez' wallet and found that he was carrying $966 in cash.  Deputy Hartleben asked Mr. Funez how he was going to buy the truck for $3,500 if he had less than $1,000 in cash with him.  Mr. Funez did not respond to the question.  Mr. Funez stated that he had started off with $1,000 and had spent some money at Walmart.

28.  The interview lasted for approximately ten or fifteen minutes.

29.  On April 23, 2013, the Grand Jury returned an indictment for Mr. Funez, charging him with three counts related to his involvement with the organization in possessing, distributing, and transporting methamphetamine.

30.  On January 30, 2014, Mr. Mendoza-Gomez pled guilty to Count One of the Indictment in this case.  Ex. 10 at 1; Ex. 10a.  Based on the charges in this case, Mr. Mendoza-Gomez is eligible for a prison sentence of ten years to life.  Mr. Mendoza-Gomez' advisory guideline sentencing range, assuming that he is a career offender, is three hundred and sixty months to life.  Based on his plea agreement, Mr. Mendoza-Gomez expects that the United States will recommend a sentence of eighteen years.

31.  At trial, the government called Mr. Mendoza-Gomez, who testified as follows.  Mr. Mendoza-Gomez began distributing pound and kilogram quantities of methamphetamine when he moved from California to Colorado in 2010.  He had the

11

drugs delivered to Mr. Salcido-Garcia's automotive shop in Commerce City, Colorado or Mr. Lujano-Gonzalez' automotive shop at 472 Laredo Street in Aurora, Colorado. Mr. Mendoza-Gomez moved back to California in 2012. He sent several kilograms of methamphetamine at a time, hidden in cars, from California to Colorado. Before August 2012, Ernesto Garcia transported drugs for Mr. Mendoza-Gomez in a green Ford Explorer. In August 2012, Mr. Garcia was arrested while transporting money back to California. After that date, Mr. Mendoza-Gomez no longer used Mr. Garcia to transport drugs.

32. Mr. Mendoza-Gomez testified that Mr. Funez began transporting drugs and cash for Mr. Mendoza-Gomez after Mr. Garcia was stopped by the police. Mr. Mendoza-Gomez met Mr. Funez through Mr. Salcido-Garcia before Mr. Mendoza-Gomez moved to California. The two became friends and Mr. Funez told Mr. Mendoza-Gomez that, if anything came up, Mr. Funez could help him, by which Mr. Mendoza-Gomez understood Mr. Funez to be offering to transport drugs. Mr. Mendoza-Gomez believed that Mr. Funez knew he sold drugs because of Mr. Funez' friendship with Mr. Salcido-Garcia, who knew about Mr. Mendoza-Gomez' drug business. In addition, Mr. Funez was present on occasions when Mr. Mendoza-Gomez delivered methamphetamine to Mr. Salcido-Garcia. The Court finds Mr. Mendoza-Gomez credible insofar as he testified that Mr. Funez knew that Mr. Mendoza-Gomez was involved in the drug business.

33. Mr. Mendoza-Gomez testified that Mr. Funez made three trips for Mr. Mendoza-Gomez from California to Colorado with methamphetamine, including the trip in January 2013 when he was arrested. Mr. Mendoza-Gomez bought Mr. Funez an

airplane tickets on one of the two trips prior to the January 2013 trip, but he could not remember which one or in which order Mr. Funez made the first two trips. On one trip, Mr. Funez flew to California and drove back to the neighborhood where Mr. Salcido-Garcia lived Colorado in a black Ford F-350 truck. The truck contained liquid methamphetamine concealed in the windshield wiper fluid reservoir. Mr. Lujano-Gonzalez was responsible for removing the methamphetamine from the wiper fluid reservoir. The liquid yielded between two and one-half and three kilograms of crystal methamphetamine. Mr. Mendoza-Gomez paid Mr. Funez' expenses for the trip and Mr. Lujano-Gonzalez paid Mr. Funez between $3,000 and $3,200.

34.    Mr. Mendoza-Gomez testified that, on another trip, Mr. Funez flew from Colorado to California. Mr. Mendoza-Gomez picked Mr. Funez up at the airport and drove him to a place near San Diego so he could visit with family who live there until the car was ready. The car was a blue Malibu. After the liquid methamphetamine was placed in the windshield wiper reservoir of the Malibu, Mr. Mendoza-Gomez met up with Mr. Funez, brought him to where the Malibu was waiting, and gave him $500 to pay for gas. Mr. Mendoza-Gomez told Mr. Funez to deliver the car to Mr. Lujano-Gonzalez and not to use the windshield wipers. Mr. Funez delivered the car and Mr. Lujano-Gonzalez paid him approximately $3,000 for making the trip. The third trip was the January 2013 trip.

35.    The Court does not find Mr. Mendoza-Gomez credible insofar as he testified that he purchased an airplane ticket for Mr. Funez prior to January 2013. This testimony is undermined by the January 8, 2013 call in which Mr. Mendoza-Gomez asked Mr. Funez for his birth date and the spelling of his name. This call suggests that

Mr. Mendoza-Gomez had not previously purchased a airplane ticket for Mr. Funez. However, the fact that the Court does not believe that Mr. Mendoza-Gomez purchased an airplane ticket for Mr. Funez before January 2013 does not cause the Court to discount the remainder of Mr. Mendoza-Gomez' testimony, particularly given that the telephone calls between Mr. Mendoza-Gomez and Mr. Funez in January corroborate their cooperation in transporting narcotics.

36.  Mr. Mendoza-Gomez testified that a woman named Adelina once transported drugs for him in a blue Volvo.  A man named Alex transported drugs for him in a black diesel truck once during the same time period, between August and January of 2013.

37.  Mr. Mendoza-Gomez testified that, in the January 7, 2013 call, Mr. Mendoza-Gomez was asking Mr. Funez to go to California and to drive back in a car containing liquid methamphetamine.  Mr. Mendoza-Gomez used the terms "document" and "paper" to refer to money.  Mr. Mendoza-Gomez told Mr. Funez to say that Mr. Funez was coming to California to buy a car in the event that Mr. Funez was asked by the police about why he was carrying so much cash.  The Court finds this testimony credible as it is consistent with the language and tone of the call, which indicate that Mr. Funez and Mr. Mendoza-Gomez recognized one another's voices, were on friendly terms, made plans to pick things up from or transport things for one another, and did not need to ask one another for clarification even when speaking in vague or general terms.  It is also supported by the fact that, when stopped by police, Mr. Funez stated that he had come to California to buy a car.

38.  Mr. Mendoza-Gomez testified that, immediately following the January 11,

2013 phone call, Mr. Mendoza-Gomez met Mr. Funez at the King Soopers, instructed him about the liquid methamphetamine in the wiper reservoir, and gave him contact telephone numbers to call when he arrived in Los Angeles.  After the police stopped Mr. Funez, Mr. Mendoza-Gomez learned from his source in California that the methamphetamine was in crystal form (as opposed to liquid), that it was in a hidden compartment, and that Mr. Funez had been shown where the compartment was so he could tell Mr. Mendoza-Gomez upon his arrival in Colorado.

39.   Mr. Lujano-Gonzalez pled guilty in a related case before Judge Robert E. Blackburn, Case No. 13-cr-00161-REB-2, to Conspiracy to Distribute 5 Kilograms More of a Mixture or Substance Containing a Detectable Amount of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II), and 846.  Ex. 9.  Mr. Lujano-Gonzalez' advisory guideline sentencing range is two-hundred and sixty-two to three-hundred and twenty-seven months imprisonment.  *Id*. at 10.  Based on his plea agreement, Mr. Lujano-Gonzalez expects that the United States will recommend a sentence of twelve to fifteen years.

40.   At trial, the government called co-defendant Lujano-Gonzalez as a witness, who testified as follows.  Mr. Lujano-Gonzalez moved to Colorado in June 2010 and worked as a car mechanic.  He owns an automotive shop in Aurora.  Approximately nine months after arriving in Colorado, Mr. Lujano-Gonzalez began transporting drugs for Mr. Mendoza-Gomez.  Sometime after Mr. Mendoza-Gomez moved to California, Mr. Lujano-Gonzalez took on greater responsibility for the organization's operations in Colorado.  He sent money from drug sales to Mr. Mendoza-Gomez by hiding cash in trucks or by transferring it through bank accounts.  He received shipments of drugs from

California and divided them up for distribution.  After Mr. Garcia was arrested, the organization started using different vehicles and started shipping liquid as opposed to crystal methamphetamine.

41.  Mr. Lujano-Gonzalez testified that Mr. Funez, who was an automobile mechanic, never worked for Mr. Lujano-Gonzalez as a mechanic.  After Mr. Garcia was stopped by the police, Mr. Funez began transporting methamphetamine from California to Colorado.  Mr. Funez made two trips before the January 2013 trip.

42.  Mr. Lujano-Gonzalez testified that, on one trip, Mr. Funez drove a black Ford truck containing liquid methamphetamine in the windshield wiper reservoir to the neighborhood where Mr. Salcido-Garcia's shop was located.  Some of the methamphetamine was sold to another member of the organization, Eliseo Avalos-Torres, on September 27, 2012.  Mr. Mendoza-Gomez told Mr. Lujano-Gonzalez to pay Mr. Salcido-Garcia for the methamphetamine in front of Mr. Funez.  After Mr. Lujano-Gonzalez paid Mr. Salcido-Garcia, Mr. Salcido-Garcia paid Mr. Funez because Mr. Funez was the one who drove the truck containing the methamphetamine.

43.  Mr. Lujano Gonzalez testified that, on another trip, Mr. Funez drove a blue Honda containing liquid methamphetamine in the windshield wiper reservoir.  Before the trip, Mr. Mendoza-Gomez told Mr. Lujano-Gonzalez that he would be sending him more methamphetamine, but Mr. Lujano-Gonzalez did not learn any of the details of the trip until Mr. Funez called to tell him that he was about to deliver the car to Mr. Lujano-Gonzalez' shop in Aurora.  Mr. Lujano-Gonzalez noticed that there were a large number of energy drink cans in the Honda and told Mr. Funez to be careful because it looked suspicious.  Mr. Lujano-Gonzalez had someone convert the liquid methamphetamine

16

into crystal; it yielded more than one pound.  Mr. Lujano-Gonzalez paid Mr. Funez for

the trip partly in cash and partly by giving him a Lincoln Town Car that was parked near

Mr. Lujano-Gonzalez' house which Mr. Funez admired.  Mr. Lujano-Gonzalez could not

remember when these two trips were made.

44.  Mr. Lujano-Gonzalez testified that, when Mr. Funez asked about

"departures" in the December 20, 2012 call between them, Mr. Lujano-Gonzalez

understood Mr. Funez to be asking if he could pick up a car containing

methamphetamine in California to drive back to Colorado.  Ex. 13 at 1.  Mr. Funez had

never picked up a car in California for Mr. Lujano-Gonzalez that did not contain

methamphetamine.  When Mr. Funez said that he would like there to be "something" for

Christmas, Mr. Lujano-Gonzalez understood him to be referring to spending money.

The Court credits Mr. Lujano-Gonzalez' testimony about the December 20, 2012 call

because the testimony is consistent with the language and tone of the call, which

indicate that Mr. Funez and Mr. Lujano-Gonzalez recognized one another's voices,

were on friendly terms, made plans to meet or pick things up from one another, and did

not need to ask one another for clarification even when speaking in vague or general

terms.

45.  Mr. Lujano-Gonzalez testified that when Mr. Funez said on the December

21, 2012 call that he could rent an SUV "so it looks really good," Ex. 15 at 2, Mr.

Lujano-Gonzalez understood Mr. Funez to mean that Mr. Funez could rent a car that

would mislead the police for the purpose of transporting drugs.  The Court finds this

testimony credible for the reasons set forth in paragraph 44.

46.  At the close of the government's case, defendant made a motion pursuant

to Fed. R. Crim. P. 29, which the Court denied.  The defendant then took the stand and

testified as follows: Mr. Funez rented an automotive yard in Commerce City where he

worked on cars.  He met Mr. Salcido-Garcia in the spring or summer of 2012 because

Mr. Salcido-Garcia had an automotive yard near Mr. Funez' yard.  Sometimes they

would get together in front of their yards and drink.  In addition, Mr. Funez rented Mr.

Salcido-Garcia yard space to park his tow truck.  Mr. Funez sometimes bought and sold

cars through Mr. Salcido-Garcia.

47.  Mr. Funez testified that he met Mr. Lujano-Gonzalez at parties held by Mr.

Salcido-Garcia.  In May 2012, Mr. Funez purchased a Lincoln Town Car and a Subaru

from Mr. Lujano-Gonzalez.

48.  Mr. Funez testified that he met Mr. Mendoza-Gomez when Mr. Mendoza-

Gomez and Mr. Salcido-Garcia brought Mr. Funez a car to paint.  Mr. Funez testified

that he met up with Mr. Salcido-Garcia, Mr. Mendoza-Gomez, and Mr. Lujano-Gonzalez

no more than two to four times each before he made the January 2013 trip.

49.  Mr. Funez testified that he did not meet with or see Mr. Mendoza-Gomez on

October 24, 2012.  However, a photograph shows that he did meet him on that date.

Ex. 5.

50.  With respect to Mr. Funez' January 7, 2013 telephone call with Mr.

Mendoza-Gomez, Exs. 19 and 19a, Mr. Funez testified that he offered to carry money

on behalf of Mr. Salcido-Garcia, who was undocumented, so Mr. Salcido-Garcia could

buy a vehicle in California.  He testified that he did not pay attention when Mr.

Mendoza-Gomez told him that, if anything happened, he should say that he was buying

a car.  The Court does not find Mr. Funez' testimony about the money discussion

18

credible.  There was no reason to use coded language to discuss Mr. Funez carrying money on the flight if the purpose was otherwise legitimate.  Moreover, it is clear from the conversation that Mr. Funez did acknowledge Mr. Mendoza-Gomez' directive to say he was coming to buy a car.

51.  With respect to the January 2013 trip to California, Mr. Funez testified that he met a man named Charlie at the Commerce City automotive yard in the fall of 2012. Mr. Funez does not know what Charlie does for a living because, at the time they met, Mr. Funez was drinking and partying with whoever came to the yard, without asking questions.  Mr. Funez met Ramon, another mechanic, the same way.  Ramon has an automotive dealer's license from Mexico and so he can buy vehicles at American Automobile Association auctions.  Ramon would buy cars at auction that Mr. Funez would fix up and re-sell.  In December 2012, Mr. Funez helped Ramon build a diesel engine for Mr. Lujano-Gonzalez.

52.  Mr. Funez testified that, in late December 2012, Charlie and Ramon told Mr. Funez that a 1994 or 1995 Dodge truck was for sale in California for $2,500 and that, if Mr. Funez could pay half the purchase price as a down payment, he could have the truck.  Mr. Funez could not afford to buy an airplane ticket at the last minute, but Charlie told him that Mr. Mendoza-Gomez could buy the ticket for him at an affordable price. The Court does not find Mr. Funez' testimony regarding Charlie, the availability of a Dodge truck in California, or the offer to buy an airplane ticket credible.

53.  Mr. Funez testified that, on January 8, 2013, Mr. Mendoza-Gomez called Mr. Funez to find out Mr. Funez' birth date and the spelling of his name, Exs. 20 and 20a; Mr. Mendoza-Gomez then purchased the airplane ticket to California.  This was the first

and only time that Mr. Mendoza-Gomez purchased a airplane ticket for Mr. Funez or that Mr. Funez traveled to California for Mr. Mendoza-Gomez.  The two did not discuss the trip to California at any time before the January 8, 2013 call.  Mr. Funez testified that he did not understand why Mr. Mendoza-Gomez bought the airplane ticket, but later testified that he did not find it unusual that Mr. Mendoza-Gomez bought him the ticket because people frequently bought things for him on credit that he later paid for in cash.  During their January 11, 2013 meeting at King Soopers, Mr. Funez paid Mr. Mendoza-Gomez close to $200 for the ticket.  Mr. Funez left for California with $1,300 to make a down payment on the truck.  The Court does not find Mr. Funez' testimony regarding paying Mr. Mendoza-Gomez for the airplane ticket credible.  At no time during the January 8, 2013 call did Mr. Funez ask about the price of the ticket.  Mr. Funez testified that he was "short on money," but demonstrated no concern on the call with how much he would eventually have to pay for the flight, an important consideration for anyone deciding whether flying to California on the mere prospect of buying a vehicle would be worth the effort.

54.  Mr. Funez testified that he drank one beer before leaving for the airport and two beers on the flight.  He expected that someone would be waiting for him at the airport holding a sign with his name on it and that he would be able to purchase the car in the airport.  When he arrived, no one was there to meet him.  He placed a call on his cell phone to the man who was supposed to sell him the vehicle and was told that the vehicle was on Atlantic Avenue.  Someone he did not know drove up and offered to give him a ride for $60 or $70, which was cheaper than taking a taxicab.  Mr. Funez told the driver that he bought and sold cars for a living and the driver gave him his business

card.  The Court does not find Mr. Funez' testimony credible.  Although surveillance officers noticed him talking on his cell phone, his cell phone records indicate that he made no outgoing calls, which contradicts his testimony.  The testimony about a man coincidentally offering him a ride is not plausible under the circumstances.

55.  Mr. Funez testified that, after arriving at Atlantic Avenue, he went to a gas station to buy a drink.  Then he went to a fast food restaurant to buy french fries so he could use the bathroom.  In the parking lot of the restaurant, he met the two men who were supposed to sell him the vehicle.  They knew that in those days he was drinking a lot.  He does not know their names.  They showed him the truck, but the side was smudged and the frame did not look right.[5]  He said that he could not drive it.  He told the men that he had to drive back to Denver the next day to go to school.  The men called Charlie to discuss the situation.  The men then drove the Envoy over from a nearby location.  The men told Mr. Funez that he could drive the Envoy back to Denver. He told them it was too big and would use too much gas.  They said he could drive the Envoy around Los Angeles and they would bring him a smaller car the next day.  The Court finds that Mr. Funez' testimony about the two men allowing him to drive the Envoy around Los Angeles is not credible.  That two men whose names Mr. Funez could not remember would allow him to drive an Envoy around Los Angeles despite Mr. Funez not being interested in the vehicle makes little sense.

56.  Mr. Funez testified that he drove the Envoy to a liquor store, bought a twelve-pack of beer, and rented a room at a motel he spotted to spend the night.  In the

---

[5]Mr. Funez initially seemed to testify that the side of the truck was "smudged," but later stated that it was "smashed."  It is unclear which term he meant to use.

morning, one of the men knocked on his motel room door and told him that he could drive the Envoy back to Denver.  On cross-examination, Mr. Funez said that he did not call this man, but that the man just showed up.  The man arrived in a blue Honda.  The man told Mr. Funez that a smaller vehicle was not available.  Mr. Funez would have to pay for the gas on the trip and, if he decided to buy the Envoy, he would have to pay $3,500 for it.  If he did not buy the Envoy, Charlie would bring it back to California.  Mr. Funez was not sure at that point whether he would buy the Envoy.  Mr. Funez did not want to fly back to California because it would be too expensive.  The Court also finds this testimony unworthy of belief.  Task Force Officers Mohlman and Cooper followed Mr. Funez to the motel and neither officer reported any stops at a liquor store or anywhere else.  Mr. Funez also offered no explanation for why the man in the blue Honda would "just show up" at the motel that Mr. Funez picked at random if he never called the man before the man showed up.  Moreover, none of the officers testified that a blue Honda went to the motel in the morning, which Mr. Funez then followed to the Home Depot.  Rather, they testified that he pulled up to the Honda, which was already parked at the Home Depot.

57.  Mr. Funez testified that he noticed that one of the tires on the Envoy was kind of flat.  He pointed this out to the man, who told Mr. Funez to follow him.  Mr. Funez got in the Envoy and followed the man to a Home Depot where the man was going to buy tools to change the tire.  The man bought various items, including wrenches, pliers, sockets, a saw, and a PVC pipe.  The PVC pipe did not fit in the Envoy, so it was cut down.  Mr. Funez did not know what the tools or the PVC pipe were for and he did not ask the other man.  This testimony of Mr. Funez is not credible.

The tools necessary to change a tire are typically in a car, and Mr. Funez and the other man had access to two cars that would presumably have such tools. Moreover, Home Depot is not a logical place to go for equipment to change a tire. Rather, an ubiquitous automobile supply store would have a tire iron and jack.

58. Mr. Funez testified that he got back in the Envoy and followed the man to a nearby house. There was another man at the house who was going to help change the tire, but they could not find a floor jack. Mr. Funez asked if he could listen to music somewhere. He sat in the passenger's seat of the blue Honda and used his cell phone to look at Craigslist postings for cars and car parts. From where he was sitting, his view of the Envoy was blocked by another car. He did not pay attention to what the two men were doing to the Envoy. He did not see them put the PVC pipe in the car or hear them mention drugs. Then he fell asleep. The Court does not find Mr. Funez' testimony about not paying attention to what was happening to the Envoy credible. The Court finds that, during the time that Mr. Funez was at this house, the methamphetamine was placed in the PVC pipe, the pipe was sealed, the pipe was concealed in the Envoy, and the area around the shock mount was painted. This process took some time given that the vehicle was there ninety minutes. The Court does not believe that Mr. Funez, an auto mechanic, would be completely uninterested in the process or not become suspicious given how long it took to change a tire.

59. Mr. Funez testified that he woke up when the two men told him that the car was ready. Before getting into the Envoy, he noticed a bag of black plastic gloves that appeared new sitting in a trash can. He picked them up and tossed them in the back of the Envoy. Mr. Funez did not inspect the tire. Instead, he got into the Envoy and

followed the blue Honda briefly before getting onto the highway.  He stopped at a Walmart to buy a car charger for his cell phone and snacks for the trip.  Ex. 47.  He stopped at a Circle K to buy gas.  Ex. 48.  It is not plausible that Mr. Funez would depart on a long drive without inspecting the tire.

60.  Mr. Funez denied transporting drugs for Mr. Mendoza-Gomez or Mr. Lujano-Gonzalez.  He testified that he never went by the nickname "Cuchifleto" or heard himself referred to by that name.

61.  On cross-examination, the government asked Mr. Funez why he did not tell Deputy Hartleben that he had the number of the man who was supposed to sell him the car on his cell phone when Deputy Hartleben asked about it.  Mr. Funez testified that he answered the questions he was asked.

62.  The government asked why Mr. Funez did not mention Charlie or Ramon at the June 14, 2013 meeting with the United States to discuss a proffer.  Ex. 57.  Mr. Funez testified that he answered the questions he was asked.

63.  The government asked Mr. Funez why he told Sergeant Hoffman that he did not like the tires on the diesel truck he was supposed to buy, but testified at trial that the problem with the truck was that the side was smashed.  Mr. Funez testified that Sergeant Hoffman might have gotten confused because Mr. Funez also mentioned that a tire on the Envoy had been replaced.

64.  Mr. Funez testified that Deputy Hartleben's testimony accurately described Mr. Funez' statements at the time he was taken to the Rancho Cucamonga station.  Mr. Funez testified that discrepancies between, on the one hand, his statements to Sergeant Hoffman or to Deputy Hartleben and, on the other hand, his testimony at trial

24

are likely due to the fact that during his arrest Mr. Funez was nervous, confused, and hung over.

65.   Mr. Funez' testimony is undermined by changes in his story over time.  For example, he told Sergeant Hoffman that he came to California to buy a vehicle for his brother's landscaping business, but he did not mention his brother's landscaping business to Deputy Hartleben or to the FBI at his proffer interview.  Ex. 58.  Mr. Funez told Deputy Hartleben that he did not have the contact information for the men who were supposed to sell him the vehicle, but Mr. Funez testified at trial that he called one of the men on his cell phone from the airport.  Mr. Funez told Deputy Hartleben that the men who loaned him the Envoy would pay for his gas to return to Colorado, but he testified that he had to pay for his own gas and, for that reason, was concerned about the cost of driving such a large vehicle.  Mr. Funez told Deputy Hartleben that he was going to buy the Envoy, but he testified that he had not yet decided whether he would buy the car or send it back to California.

66.   Finally, Mr. Funez' testimony is undermined by its inherent implausibility.  It is not plausible that Mr. Funez would fly to California to purchase a vehicle sight unseen from men he did not know and that those men would then lend him a car, free of charge, to drive back to Colorado with no clear indication of how or when the vehicle would be returned or paid for.  It is not plausible that Mr. Funez would spend nearly two days driving around Los Angeles with these men and not recall at least their first names.  It is not plausible that Mr. Funez would go to Home Depot, supposedly for his companion to buy tools to change a tire, and not ask the man why he was buying pliers, a PVC pipe, and a saw (tools not associated with tire changing) or ask the man why he

thought that the Envoy and Honda did not have a tire iron and jack in them.  The fact that the tire change should have been quickly performed is evident from Exs. 30 and 33, which show what appears to be a full-sized spare tire.

67.  The Court finds that Mr. Funez knew that Mr. Mendoza-Gomez and Mr. Lujano-Gonzalez were involved in the drug business when he agreed to go to California in January 2013 and that he went to California with the intention to transport methamphetamine from Los Angeles to Denver for distribution.

## II.  CONCLUSIONS OF LAW

### A.  Count One: Conspiracy to Possess Methamphetamine with Intent to Distribute

To convict the defendant of Count One of the indictment, the United States must prove the following elements beyond a reasonable doubt: "(1) two or more persons agreed to violate the drug laws; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily participated in the conspiracy; and (4) the conspirators were interdependent."  *United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009); 21 U.S.C. § 846.

#### 1.  Agreement to Violate the Drug Laws

Courts must be "mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement."  *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991).  The Court "cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference."  *United States v.*

26

*Hernandez*, 509 F.3d 1290, 1295 (10th Cir. 2007) (citation and quotation marks

omitted).  "Casual transactions with persons involved in a conspiracy are insufficient to

establish" a defendant's connection to the conspiracy.  *United States v. Slater*, 971 F.2d

626, 630 (10th Cir. 1992).

However, an agreement to violate the narcotics laws "may be informal and may

be inferred entirely from circumstantial evidence."  *United States v. Whitney*, 229 F.3d

1296, 1301 (10th Cir. 2000); *see also United States v. Clark*, 717 F.3d 790, 805 (10th

Cir. 2013) (common purpose may be proved by circumstantial evidence, such as "the

joint appearance of defendants at transactions and negotiations furthering the

conspiracy, the relationship among co-defendants, and their mutual representations to

third parties") (citation omitted).

The United States has proved, beyond a reasonable doubt, that Mr. Funez

entered into an agreement with Mr. Mendoza-Gomez and Mr. Lujano-Gonzalez to

violate federal drug laws.  The Court finds that, during calls made in December 2012

and January 2013, Mr. Funez volunteered and agreed to transport drug proceeds to Mr.

Mendoza-Gomez in California and to transport drugs back to Colorado for distribution

by the organization.  In light of these findings, there is no reasonable doubt that Mr.

Funez had an agreement with co-defendant Mendoza-Gomez and co-defendant

Lujano-Gonzalez to transport drugs intended for distribution in violation of federal drug

laws.

### 2.  *Knowledge of Conspiracy's Essential Objectives*

The second prong of the test requires the government to prove that the

defendant had a "general awareness of both the scope and the objective of the enterprise." *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992).

The Court finds that Mr. Funez knew that Mr. Mendoza-Gomez and Mr. Lujano-Gonzalez were involved in the sale and distribution of drugs.  The Court finds that Mr. Funez knew that the purpose of the trip to California was to obtain methamphetamine and transport it back to Colorado, hidden in a vehicle.

Accordingly, the United States has proved beyond a reasonable doubt that Mr. Funez was aware of the general scope and objectives of the enterprise–namely, transporting drugs from California for distribution and sale in Colorado.  *See United States v. Anaya*, 727 F.3d 1043, 1051 (10th Cir. 2013) ("The knowledge element of conspiracy was satisfied if the Government proved that Mr. Anaya knew that conspiracy members 'knowingly or intentionally' possessed a 'controlled substance' with the intent to distribute it.") (quoting 21 U.S.C. § 841(a)).

### 3.  Knowing and Voluntary Participation

With respect to the third prong, a factfinder "may presume that a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy." *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (citation omitted).

The Court finds that Mr. Funez knowingly and voluntarily flew to California, measured the PVC pipe against the car, helped cut the PVC pipe, was present when the car was loaded, and then drove the Envoy containing methamphetamine in the direction of Colorado with the intent of delivering it to other members of the organization

28

in Colorado.  These actions furthered the conspiracy's objective of transporting methamphetamine to Colorado for distribution.  *See Johnson*, 42 F.3d at 1319.

### 4.  Interdependence

The last prong, interdependence, is satisfied "when 'each alleged coconspirator . . . depend[s] on the successful operation of each "link" in the chain to achieve the common goal.'"  *United States v. Yehling*, 456 F.3d 1236, 1241 (10th Cir. 2006) (quoting *United States v. Dickey*, 736 F.2d 571, 582 (10th Cir. 1984)).  "[E]ach coconspirator's 'actions must facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole.'"  *Id.* (quoting *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992)).

The organization's distribution of methamphetamine in Colorado would not have been possible unless the methamphetamine was first transported to Colorado from California.  Mr. Mendoza-Gomez facilitated Mr. Funez' actions by arranging for his travel to California and by coordinating Mr. Funez' contact with the men in possession of the methamphetamine and the Envoy in which it would be hidden.  Mr. Lujano-Gonzalez facilitated Mr. Funez' actions by being prepared to accept a delivery of methamphetamine for distribution.  The three men depended on one another's actions to carry out the large objectives of the organization.  *See Yehling*, 456 F.3d at 1241.

In sum, the Court finds that the United States has proved beyond a reasonable doubt that Mr. Funez entered into a conspiracy to transport and sell methamphetamine in violation of the federal drug laws.

### B.  Count Twenty-Three: Possession of Methamphetamine with Intent to Distribute

"To prove a charge of possession with intent to distribute, the government must show that (1) the defendant possessed the controlled substance; (2) knew that he had it; and (3) possessed it with the intent to distribute it." *Pulido-Jacobo*, 377 F.3d at 1131 (quoting *United States v. Allen*, 235 F.3d 482, 492 (10th Cir. 2000)).  Intent to distribute a controlled substance "may be inferred from the possession of a large quantity of the substance." *United States v. Powell*, 982 F.2d 1422, 1430 (10th Cir. 1992).

The Court finds that Mr. Funez was driving the Envoy to Colorado, knowing that the Envoy contained methamphetamine, with the intent to deliver the methamphetamine to Mr. Lujano-Gonzalez.  Defendant knew that Mr. Lujano-Gonzalez would distribute the methamphetamine once it was delivered to Colorado.  The Court finds that the PVC pipe contained 1085 grams of a substance containing detectable amounts of methamphetamine, which is attributable to defendant.  Ex. 50.  The quantity of methamphetamine independently supports an inference that Mr. Funez intended it for distribution.

The United States has proved beyond a reasonable doubt that Mr. Funez knowingly possessed a controlled substance with the intent to distribute it.

### C.  Count Twenty-Four: Use of a Communication Facility to Commit or Facilitate a Felony Drug Offense

It is unlawful to "knowingly or intentionally [] use any communication facility in committing or in causing or facilitating the commission of any act or acts" constituting a drug felony.  21 U.S.C. § 843(b).  "The statute encompasses any use of a communications facility that makes easier the commission of the underlying felony." *United States v. Davis*, 929 F.2d 554, 559 (10th Cir. 1991).

The Court finds that Mr. Funez used the telephone on January 7, 2013, Exs. 19 and 19a, to find out about upcoming opportunities to courier drugs and to plan the January 2013 trip to California.  This call facilitated the trip to California and the subsequent possession with intent to distribute over one kilogram of a substance containing methamphetamine, which constitutes a drug felony.  *See* 21 U.S.C. §§ 802(44) and 841(b)(1)(A)(viii).

The United States has proved this charge beyond a reasonable doubt.

## III. CONCLUSION

Wherefore, it is

**ORDERED** that the Court finds defendant Santos Adolfo Funez GUILTY as charged on Count One, violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. It is further

**ORDERED** that the Court finds defendant Santos Adolfo Funez GUILTY as charged on Count Twenty-Three, violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii).  It is further

**ORDERED** that the Court finds defendant Santos Adolfo Funez GUILTY as charged on Count Twenty-Four, violation of 21 U.S.C. § 843(b).

DATED July 25, 2014.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge